**Nicholson-Upsey v. Touey**

*Daniel S. Weinstock, Andrew K. Mitnick* and *Thomas Martin*, for plaintiffs.

*Stewart J. Greenleaf* and *Frederick P. Santarelli*, for defendant Jefferson Health System, Inc. John A. Filoreto, for defendant Main Line Health, Inc.

*Dorothy Duffy, Marybeth O. Lauria* and *Adam J. Fulginiti*, for defendant Thomas Jefferson University Hospitals, Inc.

*Susan Ellis Wild, Howard S. Stevens, Andrew H. Ralston, Jr., Matthew A. Hamermesh, Ronald P. Schiller, Daniel Segal, Mark A. Aronchick*, for defendant Pottstown Hospital Company, LLC.

*Donald N. Camhi*, for defendants Charles V. Touey and Women's' Health Care, P.C.

*Matthew S. Heilman* and *Richard E. Geschke*, for defendants Robert L. Stavis and Nemours Foundation.

BERNSTEIN, *J.*, May 6, 2013—

## I. Introduction.

On August 10, 2008, at 12:55 p.m. Parrys Nicholson-Upsey was pronounced dead by defendant Dr. Charles Touey at Pottstown Hospital. One hour and fifteen minutes later baby Parrys was born, very much alive, suffering' from severe hypoxic ischemic encephalopathy. Parrys needs 24-hour nursing and medical care for the rest of her life. Hearing evidence from April 13, 2012 to May 4, 2012, the jury rendered a verdict for plaintiffs and against

defendant Pottstown Memorial Medical Center in the amount of $78,404,669. That same jury found in favor of defendants Dr. Charles Touey and Dr. Robert Stavis.

## A. The Death.

The first witness, defendant Dr. Charles Touey, was called by plaintiffs as of cross examination. Dr. Touey was Victoria Upsey and Parrys Nicholson-Upsey's delivery room obstetrician. He testified that at 12:55 p.m. Parrys Nicholson-Upsey was dead, but by a miracle came back to life and was born at 2:10 p.m.[1]

On August 10, 2008, Parrys' mother, plaintiff Victoria Upsey, presented to defendant Pottstown for the delivery of her full-term baby. Dr. Touey testified that Nurse Frances Kozlowski told him she could not locate any fetal heartbeat using the bedside fetal monitor.[2] Dr. Touey examined Victoria using a mobile ultrasound unit provided by defendant Pottstown.[3] He was certain that Parrys had died.

Dr. Touey testified that ultrasound is the "gold standard" for determining whether a baby in utero is dead or alive.[4] He was specifically asked about the equipment provided by defendant Pottstown:

Q: We could be even a little bit more accurate if we wanted to by saying that ultrasound performed with the appropriate equipment is the gold standard; correct?

1. N.T. 04/17/12, pg. 154, line 25-pg. 155 line 16. Dr. Touey told Victoria Upsey that her baby had died and was a "miracle birth." N.T. 04/17/12, pg. 165 lines 6-12. He told the jury the same thing. N.T. 04/17/12, pg. 89, lines 11-13.
2. N.T. 04/17/12, pg. 207, lines 18-21.
3. N.T., 04/17/12, pg. 210, lines 11-23.
4. N.T., 04/17/12, pg. 66, lines 8-13.

A: Correct, the appropriate equipment where we can see the heart.

Q: We could be more specific still by saying properly performing ultrasound with the appropriate equipment is the gold standard when trying to determine if a baby is dead or alive, correct?

A: Correct.

Q: The standard of care required that you use the appropriate equipment; right?

A: Correct.[5]

Despite being "100 percent certain" that baby Parrys was dead, Dr. Touey ordered a second ultrasound to be performed "stat" by Pottstown's radiology department.[6]

Dr. Touey testified that since he was 100 percent convinced that the baby had died, he had ordered the ultrasound only to document fetal demise,[7] and for one other reason. He said he ordered a second ultrasound because he believed his maternal patient, Victoria Upsey, was so upset by being told that her baby was dead that she needed time to recover. When he told Victoria that her baby had died:

The room was incredibly emotional, which was completely understandable, but there was hysteria cast in the room. And at that point, I thought that the

---

5. N.T., 04/17/12, pg. 66 line 14 - pg. 67 line 4.

6. "Stat" as a medical term means: "as quickly as possible." N.T., 04/17/12, pg. 14, lines 13-15; N.T., 04/20/12, pg. 68, lines 7-16.

7. The medical summary was not written by anyone with any direct knowledge, and its author, Nurse Kozlowski, made several significant mistakes, including incorrectly checking a box that said there were no fetal monitoring strips, even though they were immediately available to her. N.T., 04/25/12, pg. 123 line 17 - pg. 124 line 7.

ultrasound would give us some time so that when the patient came back from ultrasound, we could sit down and discuss what the next move was.[8]

Since he was certain Parrys Nicholson-Upsey was dead, he never inquired how long it would take Pottstown to do an ultrasound. The ultrasound, ordered "stat" at 12:55 p.m., was not performed for over 1 hour and 15 minutes, at 2:10 p.m.[9]

Dr. Touey also testified that he may never have asked Victoria about fetal movement because he expected any nurse's history in the medical chart would include notes about whether or not the mother felt her baby moving.[10] Fetal movement is supposed to be charted.[11] Nonetheless, the medical chart in this case does not reveal whether Nurse Kozlowski ever asked Victoria if she felt fetal movement. Nothing in the medical chart mentions fetal movement.[12]

Dr. Touey testified that if he had any suspicion, no matter how small - even 1 percent - that the baby could possibly have been alive, the standard of care required an immediate C-section delivery. He testified that if there was even a one-in-a-hundred chance that the baby was alive at 12:45 p.m., he would have taken Victoria to an immediate caesarian delivery.[13]

Dr. Touey unequivocally and repeatedly testified:

Q: You were literally 100 percent positive that this baby was dead at 12:55 correct?

---

8. N.T., 04/17/12, pg. 12 line 23 - pg. 13 line 7.
9. N.T., 04/17/12, pg. 15, lines 7-11.
10. N.T., 04/17/12, pg. 24, lines 7-11.
11. N.T., 04/17/12, pg. 29, line 23 - pg. 30, line 6.
12. N.T., 04/18/12, pg. 238, lines 23-25.
13. N.T., 04/17/12, pg. 33, lines 3-25.

A: Without a doubt.[14]

Dr Touey testified that although the ultrasound transducer provided by Pottstown was from the 1990's he could visualize the baby's heart.[15] Dr. Touey volunteered "it is the machine they still have today."[16] He acknowledged that it was possible to see blood flow, even when not looking directly at the heart, if color imaging was used.[17] He also agreed that color makes it easier to see fluid moving, and that if a heart were beating there would be fluid moving. He agreed the machine had limitations. The machine provided by Pottstown did not have color imaging.[18]

*B. The Resurrection Defense.*

The first defense theory was that after baby Parrys Nicholson-Upsey died, she and came back to life 1 hour and 15 minutes later:

Q: Dr. Touey, you are 100 percent positive that what happened on August 10th is that this baby died and then came back to life without being resuscitated; correct?

A: Yes, I was 100 percent sure when I did an ultrasound, I took my time I looked and I looked and I looked for 10 minutes I did not see one beat of heart.[19]

Dr. Touey purported to believe resurrection can happen:

---

14. N.T., 04/17/12, pg. 34, lines 2-5.
15. N.T., 04/17/12, pg. 73 line 24 - p. 74 line 3. The machine he used had only the capability of printing still pictures. Accordingly, there were no pictures presented at trial which could demonstrate whether there was a moving or beating heart. N.T., 04/17/12, pg. 71, lines 17-25.
16. N.T., 04/17/12, pg. 75, lines 2 -21.
17. N.T., 04/17/12, pg. 78 line 16 - pg. 79 line 13.
18. N.T., 04/17/12, pg. 78, lines 5-7.
19. N.T., 04/17/12, pg. 79, lines 17-23.

Q: Doctor the idea that a baby's heart could stop, the baby died in utero, and then the baby could come back to life 10 minutes or more later is absolute fantasy. Isn't that true?

A: No it's not.[20]

Throughout his testimony, Dr. Touey remained "100 percent" positive that Parrys Nicholson-Upsey had died and miraculously returned to life. In fact he called Parrys Upsey a "miracle baby."

Dr. Touey agreed that even a 5 or 10 minute delay in delivery increased the risk that the child would have brain damage.[21] Dr. Touey also agreed that if he began an emergency C - section at 12:45 p.m., the baby would have been delivered between 1:00 p.m. and 1:07 p.m.[22] Dr. Touey also agreed:

Q: If there was any heartbeat, no matter how weak, doctor, no matter how slow, if it was there and you missed it, you were negligent, correct?

A: That is correct, on the ultrasound.[23]

There was an 81 minute delay in the delivery of the baby. Dr. Touey admitted:

Q: Even if she had some degree of brain damage, doctor, the 81 minutes surely made it worse to a reasonable degree of medical certainty isn't that right?

20. N.T., 04/17/12, pg. 80, lines 15-20. Dr. Touey admitted that he had never in his life seen or heard of a still fetal heart on ultrasound begin beating without medical resuscitation. Nonetheless, the doctor would not concede that it was even possible that he had made a mistake.
21. N.T., 04/17/12, pg. 135, lines 10-13.
22. N.T., 04/17/12, pg. 137, lines 17-21. N.T., 04/17/12, pg. 155, lines 21-24.
23. N.T., 04/17/12, pg. 154, lines 11-15.

A: You would think, yes.[24]

Dr. Touey used a 3.5 megahertz (MHz) transducer, supplied by defendant Pottstown. He testified that he had no trouble with the equipment, and saw what he expected to see.[25] Dr. Touey was asked:

Q: Do you believe, Dr. Touey, do you believe that the most plausible explanation for the discrepancy between the ultrasound you did and the ultrasound that the tech later did is that you did one using retired or old units that don't have enough sensitivity or resolution to pick up a heartbeat.

A: Absolutely not.[26]

*C. The Revelation.*

Over the course of the trial, Dr. Touey learned that the equipment provided by defendant Pottstown had been inadequate.

A case management order set clear deadlines for discovery and the exchange of expert reports. This has been procedure in every Philadelphia County case since 1995. In this case, all counsel agreed to ignore the court - ordered deadlines.

When medical records were subpoenaed in discovery, defendant Pottstown failed to provide any fetal monitoring strips. Neither Dr. Touey nor Nurse Kozlowski mentioned that fetal monitoring strips even existed in their depositions. Further, the medical records made no mention of the strips. Indeed the medical records indicated "none"

24. N.T., 04/17/12, pg. 161, lines 2-7.
25. N.T., 04/17/12, pg. 182, lines 14-20.
26. N.T., 04/17/12, pg. 153, lines 8-15.

in the place asking for the kind of monitoring strips. But Pottstown Nurse Kozlowski and Dr. Touey knew there were monitoring strips.[27] Naturally, no expert report of any party produced before the expert report deadlines made any mention of fetal monitoring strips.[28]

Less than three months before trial, defendant Pottstown revealed that they indeed had the fetal monitoring strips created by the bedside Doppler ultrasound transducer Nurse Kozlowski used when Victoria Upsey presented to the hospital. These fetal monitoring strips had always been part of the hospital's medical records. Once they had been provided, every expert report became inoperative or needed supplementation to include this obviously relevant and important new material. Every expert had to submit new reports after the fetal monitoring strips were finally disclosed. The fetal monitoring strips were so important that days of trial testimony were occupied with expert interpretation of the fetal monitoring strips.[29]

### D. The Community Hospital Defense.

Counsel for defendant Pottstown emphasized in his opening speech, and repeated throughout the trial, the theme that defendant Pottstown is a "community hospital:" "We're a community hospital. It's a level one nursery, which is the lower level. It goes up to like Bryn Mawr

---

27. N.T., 04/24/12, pg. 69 line 24 - pg. 71 line 9.

28. For example, defense expert Dr. Balducci testified that the first time he saw the fetal monitor strips was three weeks before he testified. N.T., 04/24/12, pg. 94, lines 20-22.

29. See testimony of Dr. Charles Touey, N.T., 04/17/12, pg. 116, line 5 - pg. 118, line 15; Dr. Ronald Bolognese, N.T., 04/20/12, pg. 42, line 16 - pg. 62, line 11, pg. 110, line 9 - pg. 118, line 8; Dr. James Balducci, N.T., 04/24/12, pg.73, line 15 - pg. 78 line 17; N.T., 04/25/12, pg. 39 line 7 - pg. 47 line 17, pg. 74 line 17 - pg. 75 line 13; Dr. Turhi Gopal, N.T., 04/26/12, pg. 97 line 9 - pg. 101 line 6; Nurse Catherine Cochell, N.T., 04/26/12, pg. 70 line 4 - pg. 84 line 7.

Hospital is a level three and you have some of your larger Philadelphia Hospitals."[30] Furthering his community hospital theme, Mr. Stevens continued:

> [Pottstown Hospital] doesn't have things like neonatologists, doesn't have maternal fetal medicine experts like the plaintiffs are bringing you. There's none of those people on staff. They send the patients to Bryn Mawr when they are needed when they can't take care of the patients. Without that, they take care of them at the hospital.[31]

He went on about the ultrasound equipment:

> I also represent the hospital. It's our ultrasound machine, we agree. There's no question about that. This ultrasound machine, you'll hear, was perfectly fine. It worked fine. Dr. Touey didn't have any problems with it. It's been used thousands of time, all kinds of patients. There's not even a requirement that you have an ultrasound machine, but we happen to have one; and so we have it available as an extra tool for the doctors to use. Dr. Touey used it, he was able to see the baby, make out her anatomical parts; and the most important one was the heart, the four chambers of the heart, which, in a beating heart, you see those four chambers moving. If you don't see the beating heart, you see the four chambers not moving. That's our ultrasound machines, so we'll defend them as well.[32]

He continued:

> If [Dr. Touey] had an inkling, even an inkling that

---

30. N.T., 04/16/12, pg. 118 line 24 - pg. 119 line 5.
31. N.T., 04/16/12, pg. 119 lines 12-20.
32. N.T., 04/16/12, pg. 124 line 25 - pg. 125 line 23.

there was fetal life here, that there was a reason to do something, he'd have done the C section. . . . And the same is true with - they make these allegations that the ultrasound machine wasn't any good. The ultrasound machine has to be a reasonable ultrasound. Here it worked fine. He was able to visualize everything he did fine. Is this a state-of-the-art machine? No. Was it a good machine? A working machine? Could it do its job? Absolutely. You'll hear all about that.[33]

Talking about the delay between 12:55 p.m. and 2:10 p.m., before the second ultrasound performed and a beating heart detected, he said:

So we'll talk to you about that in our time line when we get to that point, but there isn't any delay in getting that. In the community hospital setting, he's not required to have it, and that's just - that's why there will be [zero] evidence that's presented by the plaintiff even that shows we're in violation of something. Just a guy's opinion they should have that isn't substantiated.[34]

With respect to the fetal monitoring strips, Mr. Stevens said:

Here's the original medical record (indicating). Plaintiffs requested it, and an outside copy service, when people request it, sent it to the outside copy service. They copied it. They copied all the records. On the back here is the fetal monitor strip. For whatever reason, they didn't copy it until during the course of this case, when I discovered that if you have a fetal monitor, you should have a fetal monitoring strip. Went

---

33. N.T., 04/16/12, pg. 129 line 20 - pg. 130 line 11.
34. N.T., 04/16/12, pg. 131, lines 13-23.

to the archives, got it, gave it to them three months ago; so they've had it. There hasn't been any hiding of anything. These things - you'll see, the original looks like that, but it's an accordion - type device.[35]

. . . .

She was examined by the doctor, bedside ultrasound; and the doctor concluded that Parrys, the baby, was, in fact, dead in the womb.... They then told me there was a second sonograph performed about an hour and 15 minutes later from the initial ultrasound, and the results from that was that there was, in fact, a heartbeat and that there was breathing pattern, something like 70 percent. And at that point, they decided to do an emergency C section.[36]

Mr. Stevens gave a name to the miracle of Parrys Upsey returning to life: "The [Lazarus] Syndrome. Weird things happen, kind of unexplained things in medicine."[37] Mr. Stevens claimed in his opening, and witnesses testified during trial to "hearing" about similar resurrections happening in Reading, Pennsylvania, and in New Jersey.

*E. The Recantation.*

In a remarkable transformation, Dr. Touey, was also called by his own counsel, as the last witness at trial.[38] In this testimony, Dr. Touey entirely recanted his prior testimony:

Q: You, Sir, have been - today is the two week

---

35. N.T., 04/16/12, pg. 145 lines 6-24. Although counsel for the hospital was present at Dr. Touey and Nurse Kozlowski's depositions, they claim not to have noticed that fetal monitoring strips were absent.
36. N.T., 04/16/12, pg. 154 line 23 - pg. 155 line 12.
37. N.T., 04/16/12, pg. 164, lines 14-16.
38. N.T., 04/27/12.

anniversary of selecting our jury. Have you been here for every day and every minute of this trial?

A: Yes I have.

Q: And have you seen experts from various places sit up there and give testimony in their opinions?

A: Yes I have.

Q: Have you been listening?

A: Yes.

Q: During the course of this trial, Dr. Touey, have you seen anything or heard anything from your careful watching and listening that caused you to believe that maybe there is another alternative explanation for what back on August 10, 2008?

A: Well, when you hear an ultrasound expert say that this heart was so weak and had such a slow rate and so irregular that it could have been moving but undetectable from the machine that I was using, I mean you can't deny that possibility.[39]

In a dramatic courtroom moment, Dr. Touey recanted his prior testimony. He no longer claimed that baby Parrys Nicholson-Upsey had miraculously returned from the dead. He abandoned the resurrection defense. Four years after declaring the baby dead, he finally acknowledged that Parrys had been alive at 12:15 p.m. He testified that

_____
39. N.T., 04/27/12, pg. 80, lines 6-25. On redirect, counsel for the hospital asked:

Q: Doctor, did you use the same ultrasound equipment that you used in your professional practice since the time you got to Pottstown on all the patients, the same machine?

A: At the hospital yes.

N.T., 04/27/12, pg. 84 line 25 - pg. 85 line 5.

the machine provided by defendant Pottstown had not been adequate to see Parrys' heartbeat, which had been there all along:

Q: Can we agree sitting here today that while you were performing your ultrasound study, the baby was alive?

A: The fact that the baby had a heartbeat at 2:10 I would have to agree with that, yes.[40]

. . . .

Q: Now, Doctor, you testified in response to Mr. Camhi's questions that you didn't realize until during this trial that there could be a very slow heartbeat and slow enough that with certain equipment it wouldn't be picked up on ultrasound; right?

A: Well that's what one of the specialists said, yes.

Q: You're referring to the testimony of Dr. Balducci; right?

A: Correct.[41]

Q: [W]e now know using the benefit of everything that you learned during this trial that the heart had to have been beating during the ultrasound because it would be medically impossible for the baby to die and come back to life ten minutes later; right?

A: I agree with that[.][42]

*F. The Inadequate Ultrasound.*

Dr. Balducci, a defense expert called by defendant

---

40. N.T., 04/27/12, pg. 90, lines 10-14.
41. N.T., 04/27/12, pg. 96, lines 3-13.
42. N.T., 04/27/12, pg 97 line 25 - pg. 99 line 10.

Pottstown, is an OB/GYN maternal fetal medical specialist, a high-risk obstetrician. He explained that the ultrasound equipment provided to Dr. Touey by Pottstown was inadequate. Dr. Balducci unequivocally testified that the fetal heart rate did not necessarily appear on the Doppler ultrasound transducer used by Nurse Kozlowski "because either the heart was moving so slowly and wasn't contractile, was hypocontractile where the heart was not pumping hard or the heart had stopped."[43]

Likewise, Dr. Balducci testified that the 3.5 MHz transducer used by Dr. Touey in his portable ultrasound machine was inadequate to the task:

> The bottom line is I'm sure he saw the heart, but he was unable to see the heart moving. So that leaves one of two possibilities. Either the heart was still beating, at which time it was beating in the 40 to 80 [beats per minute] range with poor contractility, and with that machine 3.5 megahertz, that machine can shoot their images from six centimeters to 24 centimeters. The place of the heart was at 18 centimeters and the resolution is poor at that point. This machine, the Siemens Proline machine will shoot at a rate of about six frames per second, four to six frames per second down at that level, and the bottom line he could have actually been looking at the heart and not seeing it move even though it was contracting like this, 40 beats, 60 beats, a minute. And so in reality he provided the standard of care, he did the right thing, but the machine was not capable of seeing the hypoventricular movement, which would make sense because on that tracing you just had, you had about a three-minute contraction.[44]

---

43. N.T., 04/24/12, pg. 6 line 24 - pg. 7 line 3.
44. N.T., 04/24/12, pg. 7 line 25 - pg. 8 line 22.

Dr. Balducci opined that with that machine there was a very high potential for mistake"[45] He explained:

> A baby's heart that's running bradycardic, and "brady" means slow, a slow heart rate, a bradycardic heart that's beating anywhere between 40 and 80 beats a second, that the heart is not contracting well, it is a potential *and very high potential* that you will not see the heart move as you look at it.[46]

Dr. Balducci specifically described the inadequacies of the ultrasound equipment:

> Q: Okay. Tell us why that didn't pick up a fetal heart rate.
>
> A: Because the baby was already impaired, it's already been acidotic from the abruption that's been going on from four to seven days earlier that worsened 8 o'clock that morning. So, you know, that baby should have been able to see the heart rate between 120 and 160 and it wasn't found either by the Hewlett Packer or by the Siemen's ultrasound machine, with two different modalities and two experienced providers.[47]

To a reasonable degree of medical certainty he testified that the ultrasound provided by defendant Pottstown couldn't detect Parrys Nicholson-Upsey's heartbeat:

> Q: Do you have an opinion based on a reasonable degree of medical certainty why in the 12: 37 to 12:55 time frame that heart beat couldn't be detected up on

---

45. N.T., 04/24/12, pg. 41 lines 7-23.
46. N.T., 04/24/12, pg. 41 line 24-42 line 6 (emphasis added). Plaintiff's experts rendered opinions that the use of the particular ultrasound machine fell below the standard of care. See testimony of Dr. Bolognese, N.T., 04/20/12, pg. 65, lines 13-23.
47. N.T., 04/24/12, pg. 63, lines 9-19.

the labor and delivery floor? What are the explanations for that?

A: We explained that. The heart was already impaired, it wasn't beating like this, it was barely moving, and the ultrasound machine that is thestandard ultrasound machine in labor and delivery at 17, 18 centimeters would not be able to detect that.[48]

So I believe that the heart was impaired and it was contracting correctly and there's always a potential that the heart may stop for a few seconds on and off and the frame rate was unable to pick it up.[49]

If the jury accepted Dr. Balducci's testimony, or accepted Dr. Touey's testimony when he finally acknowledged his mistake, the only question remaining for jury determination was whether the machine used by this community hospital met the medical standard of care for a hospital in Pennsylvania.[50]

### G. The Two Possibilities.

In addition to testifying that Pottstown's equipment was deficient, Dr. Balducci disagreed with Dr. Touey's entire testimony:

Q: Dr. Balducci, you read the deposition of Dr. Touey, didn't you?

A: Yes, sir.

Q: And you read his trial testimony from earlier this

---

48. N.T., 04/24/12, pg. 64, lines 12-21.
49. N.T., 04/24/12, pg. 65, lines 2-6.
50. Under Pennsylvania law, a hospital has "a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment[.]". *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991).

week as well, didn't you?

A: Yes, sir.

Q: Do you agree with anything that Dr. Touey said about the timing or cause of this injury?

A: No, I don't believe I do.

Q: You completely disagree with just about every single word in the deposition and trial testimony of Dr. Touey that is relevant to this case; right?

A: That's correct.[51]

Dr. Balducci clearly, unequivocally, and repeatedly offered opinions about the inadequacy of the ultrasound equipment provided by Pottstown:

Q: To a reasonable degree of medical certainty, Dr. Balducci, the reason that Dr. Touey didn't identify a beating heart in Parrys Upsey's chest is because the equipment he was using was not sensitive enough to find it; true or false?

A: True.

Q: And if Dr. Touey had been using more sensitive equipment, to a reasonable degree of medical certainty this baby would have been delivered 81 minutes sooner; true or false?

A: True.[52]

If Dr. Touey had used a 2.0 MHz transducer, he may have found the heartbeat.[53] Dr. Balducci clearly also testified

51. N.T., 04/24/12, pg. 72 line 23 - pg. 73 line 11.
52. N.T., 04/24/12, pg. 80, lines 13-23.
53. N.T., 04/24/12, pg. 87, lines 3-8.

that the Pottstown equipment increased the risk that this misdiagnosis would occur:

> Q: Do you agree with me, doctor, that the fact that a 3.35 megahertz transducer was used rather than a lower frequency transducer increased the risk that this missed diagnosis would occur?

> A: That's correct.[54]

Defense expert Dr. Turhi Gopal also confirmed plaintiffs' claim that the ultrasound equipment the hospital provided was inadequate:

> The only way I can explain [the inability to locate a fetal heart rate] is when the massive insult to the baby occurred, as a result of sudden deprivation of considerable amount of blood supply, the heart becomes stunned and goes into a severe deep bradycardia. Severe bradycardia can be as low as one per minute. It is so slow as to be undetectable on ultrasound or on a fetal monitor.[55]

All Pennsylvania hospitals must comport with the national standard of care, including this community hospital.[56] Pottstown is part of a nationwide 392 hospital conglomeration. Despite Pottstown counsel's opening,

---

54. N.T., 04/24/12, pg 87, line 9-13.

55. N.T., 04/26/12, pg. 93, lines 2-11.

56. *Thierfelder v. Wolfert*, 52 A.3d 1251, 1268 (Pa. 2012) (Discussing national standard of care, and holding that "medical specialists may properly be held to the particularized standard of care governing their area of specialty."); *Winschel v. Jain*, 925 A.2d 782, 797 (Pa. Super. Ct. 2007) (holding that specialist health care provider held to a ordinary reasonableness standard of care); *Maurer v. Trustees of the Univ. of Pennsylvania*, 614 A.2d 754, 758 (Pa. Super. Ct. 1992) (same); *See also Rauch v. Mike-Mayer*, 2001 PA Super 270, 783 A.2d 815, 826 (Pa. Super. Ct. 2001) ("Our law will impose liability if the hospital fails to ensure a patient's safety and well being at the hospital.")

and the implication that it should not be held to the same medical standards as other hospitals, even national medical defense expert Dr. Balducci agreed that community hospital Pottstown was required by the standard of care to provide appropriate equipment.[57] He agreed with plaintiffs' expert Dr. Ronald Bolognese, that defendant Pottstown was required to meet a national standard of care, and failed to do so.[58]

More specifically, defense expert Dr. Balducci agreed that the recommendations of the American Institute of Ultrasound and Medicine was the applicable standard of care,[59] which even community hospitals like Pottstown had to meet.[60] He agreed that this standard of care provided that a lower frequency transducer was needed to provide adequate ultrasound penetration for obese women patients.[61]

Dr. Balducci explained:

Q: And it's your opinion that with 3600 snapshots, none of them happened to coincide with any of the 800 times that the heart was moving so it wasn't seen?

. . . .

A: It's my opinion.[62]

Defense expert, Dr. Balducci unequivocally testified that there were only two possibilities, and neither was the resurrection theory the defense had presented in opening addresses and earlier testimony. Either the equipment

---

57. N.T., 04/24/12, pg. 89 line 22 - pg. 90 line 11.
58. N.T., 04/20/12, pg. 63 line 19 - pg. 64 line 20.
59. N.T., 4/25/12, page 48, lines 12-15
60. N.T., 4/25/12, page 48, lines 16-21.
61. N.T., 4/25/12, Pg. 48 line 22 - pg. 49 line 3.
62. N.T., 4/25/12, pg. 53, lines 3-11.

failed to show a heartbeat, or there was medical negligence:

Q: Doctor would you agree with me that one of two things happened in this case; either this heart beat about 800 times but never at the same time of any of those 3600 images. That's one possibility. And the only other possibility is negligence is the explanation for what happened; right?

A: That's it.[63]

Defense expert Dr. Balducci repeatedly asserted that Dr. Touey had been fooled:

And so he was fooled, in essence, if that heart was moving. I don't believe the baby was dead the whole ten minutes. That's why I disagree with him. But if the heart was just moving slowly and not like this (indicated), that could actually be missed on a machine of that type at 18 centimeters.[64]

He unequivocally agreed with plaintiffs theory: "What I find is that this is a mishap in regards to this is a sick baby where the heart is not moving well at all, and the machine doesn't have the technical capacity to see those movements."[65]

Defense expert Dr. Balducci repeatedly said that Dr. Touey had been fooled by the ultrasound machine.[66] He was asked:

Q: This misdiagnosis occurred to a reasonable degree of medical certainty because the equipment provided to Dr. Touey was only capable of four to six images per

---

63. N.T., 4/25/12, pg. 53 line 22 - pg. 54 line 6.
64. N.T., 4/25/12, pg 72, lines 11-18.
65. N.T., 4/25/12, pg 74, lines 8-13.
66. N.T., 4/25/12, pg. 85, lines 7-9.

second and worked with a 3.5 megahertz transducer?

A: That's correct, that in regards to where the baby was lying, how deep it was and the circumstances that an abruption occurred and the heart wasn't moving well.[67]

He also agreed that the 81 minute delay in delivery caused additional brain damage:

Q: And it is also your opinion, which you expressed to a reasonable degree of medical certainty, that Parrys Upsey suffered brain damage because Pottstown Memorial Medical Center provided for Dr. Touey a 3.5 megahertz transducer with a machine that only takes four to six images per second; right?

A: Some brain damage. I believe most of it occurred before admission.[68]

Plaintiffs called Dr. Roy Filly, a radiologist, to teach the jury about ultrasound transducers. He offered no standard of care opinion until solicited by defense counsel on cross-examination. He explained that the frequency of an ultrasound transducer determines the depth the ultrasound can penetrate and the clarity of its image. A higher frequency results in greater clarity at the expense of penetration. A lower frequency trades clarity for penetration.[69] Dr. Filly believed that a 2.0 or 2.25 MHz transducer was appropriate to use with Victoria and Parrys. Pottstown provided a 3.5 MHz transducer.[70] An expert can testify to educate the jury on concepts involved in a case without presenting any specific opinion testimony. Pennsylvania

---

67. N.T., 4/25/12, pg. 85, lines 10-18.
68. N.T., 4/25/12, pg 85 line 19 - pg. 86 line 3.
69. N.T., 4/18/12, pg. 67, lines 9-19.
70. N.T., 4/18/12, pg. 71 line 21 - pg. 72 line 2.

Rule of Evidence 702 specifically states that an expert "may testify in the form of opinion or otherwise[.]"[71] That is what plaintiffs called Dr. Filly to do.

The issue of whether this ultrasound equipment met the hospital's standard of care was definitively answered by plaintiffs' expert. Dr. Ronald Bolognese, a maternal fetal medicine doctor and OB/GYN. He testified that a 3.5 MHz transducer was inappropriate for use on a patient like Victoria Upsey who weighs 273 pounds.[72] He offered a clear unequivocal standard of care opinion that Pottstown "failed to provide adequate equipment or the availability of an inhouse tech."[73]

## II. The Appeal.

On appeal defendant Pottstown raises ten issues.[74] Some can be easily dismissed.

*1. Pottstown Never Correctly Objected to Venue, Probably Because Venue was Proper.*

Defendant Pottstown waived any substantive objection to venue because it did not file preliminary objections challenging venue.[75] Nonetheless, defendant argues that

---

71. Pa.R.E. Rule 702.

72. N.T., 4/20/12, pg. 63, lines 8-14.

73. N.T., 4/20/12, pg. 65, lines 22-23.

74. Defendant's 1925(b) statement, due to typographical errors, lists thirteen errors although only ten are actually described. In the last paragraph of defendants' 1925(b) statement defendant attempts to reserve the right to present issues not raised in the statement on appeal. This purported reservation is explicitly prohibited by the Pennsylvania Rules of Appellate Procedure: "Issues not included in the Statement . . . are waived." Pa. R.A.P. 1925(b)(4)(vii).

75. See Pa. R. Civ. P. 1006(e); *Zappala v. Brandolini Prop. Mgmt.*, 849 A.2d 1211, 1213 (Pa. Super. Ct. 2004) ("The language of this rule is mandatory improper venue must be raised by preliminary objection or it is waived."); *Hohlstein v. Hohlstein*, 296 A.2d 886, 888 ("The proper manner in which a party may raise improper venue is by preliminary objection, and if it is not so raised shall be waived.").

a proper claim of medical malpractice which occurred in Philadelphia should be ignored when there is another claim of malpractice in another county.

In a medical malpractice case if there is proper venue for any one health care provider there is proper venue for all defendants.[76] Venue is proper against a defendant health care provider "in a county in which the cause of action arose."[77] After Parrys was born at Pottstown Hospital, she was unresponsive and suffering asphyxia. She was intubated and transferred by ambulance to Thomas Jefferson University Hospital in Philadelphia. Defendant Dr. Robert Stavis, a neonatologist, accompanied Parrys and treated her throughout the ambulance transfer. Upon arrival in Philadelphia, Parrys' endotracheal tube had been clogged with mucous and blood.[78] plaintiff's expert Dr. Marcus Hermansen testified that allowing the endotrachel tube to become clogged during transport was malpractice. Dr. Hermansen's testimony was that malpractice occurred in Philadelphia County, and the malpractice contributed to Parrys' brain damage.[79] Dr. Hermansen testified that Dr. Stavis negligently failed to monitor Parrys during transportation to Jefferson Hospital in Philadelphia.[80] The medical malpractice action against Dr. Stavis withstood a motion for compulsory non-suit and a motion for directed verdict. The fact that the jury found in favor of Dr. Stavis cannot retroactively make venue improper. Clearly there was proper venue in Philadelphia.

*2. The Complete Loss of Lifetime Earning Capacity can be Properly Valued by a Jury at $2,000,000.*

76. Pa. R. Civ. P. 1006 (c)(2).
77. Pa. R. Civ. P. 1006 (a.1).
78. N.T., 4/23/12, pg. 86, lines 15-22.
79. N.T., 4/23/12, pg. 99, lines 9-23.
80. N.T., 4/23/12, pg. 91, lines 7-13.

Defendant Pottstown claims that the verdict for lost earnings was excessive. The jury rendered a verdict of $2,000,000. The unrebutted medical testimony was that Parrys Nicholson-Upsey can never be gainfully employed in any capacity. Also unrebutted was the testimony of plaintiffs' forensic economist, Royal Bunin, M.B.A. He opined that if Parrys earned only a bachelor's degree her lost future earnings will be $1,269,994.[81]

The jury can properly evaluate a lifetime of earnings. This jury was properly instructed:

> The minor plaintiff is entitled to receive a sum of money that fairly and adequately compensates her for all future loss of earnings and earning capacity. To make this determination, you have to decide the total amount the minor plaintiff would have earned during her life if the injury had not occurred, and this sum must be reduced to present value.[82]

The jury was asked to determine whether Parrys would have only gotten a bachelors degree or whether Parrys would have earned a master's degree or a doctorate. The jury also needed to determine whether Parrys would have worked only to age 65, as assumed by Bunin, or, as many are forced to do, work to age 70 or older. The jury had to determine whether Parrys earning capacity would have been the average, as assumed by Mr. Bunin, or higher than average. These are all proper jury determinations.

No expert testimony is required for a jury to determine future lost earning capacity. Rather, lost earning capacity becomes a jury issue whenever evidence is presented that

81. N.T., 4/23/12, p.m., pg. 60 line 21 - pg. 61 line 15.
82. N.T., 5/1/12, pg. 36 line 20 - pg. 37 line 5.

the plaintiff's economic horizons have been diminished.[83] In *Janson v. Hughes,* the Superior Court held that testimony at trial that the plaintiff would have a permanent injury and that it would restrict his occupational activities was sufficient to require a jury to determine lost earning capacity.[84] Jurors do not need, nor are jurors required to accept expert testimony. Neither is the jury limited by expert testimony.[85] Expert testimony is intended to "help" the jury.[86]

An expert witness' opinion does not set a ceiling for a jury verdict for loss of earning capacity. Rather, a verdict will be disturbed only if it bears no resemblance to proven damages. In *Kiser v. Schulte,* the Supreme Court addressed a rare instance in which a jury verdict bore so little relation to the evidence that it warranted a new trial as to damages. The testimony at that trial established a loss in excess of $800,000, while the jury only awarded $25,000.[87] That court made it clear that if a jury verdict bears a relation to the evidence, it will not be disturbed:

> It is the province of the jury to assess the worth of the testimony and to accept or reject the estimates given by the witnesses. If the verdict bears a reasonable resemblance to the proven damages, it is not the function of the court to substitute its judgement [sic]

---

83. *See Harding v. Consolidated Rail Corp.,* 620 A.2d 1185, 1194 (Pa. Super. Ct. 1993) ("The test for impaired earning capacity is whether the economic horizon of the disabled person has been shortened because of the injuries sustained as a result of the tortfeasor's negligence.").

84. *Janson v. Hughes,* 455 A.2d 670, 671 (Pa. Super. Ct. 1982).

85. *Carroll v. Avallone,* 939 A.2d 872, 875 (Pa. 2007) ("[A] jury is not obliged to believe or disbelieve any evidence presented at trial, including an expert's opinion.").

86. Pa.R.E. Rule 702(b).

87. *Kiser v. Schulte,* 648 A.2d 1, 4 (Pa. 1994).

for the jury's.[88]

A court should consider six factors to determine if a verdict is excessive: (1) the severity of the injury; (2) whether the injury is manifested by objective physical evidence or is only subjective; (3) whether the injury is permanent; (4) whether the plaintiff can continue to work; (5) the size of out of pocket expenses; and (6) the amount of compensation demanded in the original complaint.[89]

Here, the first, third, and fourth factors are relevant to the award of $2,000,000. Parrys Nicholson-Upsey will suffer from severe cerebral palsy for the rest of her life. She will never be employed. The jury's verdict does not shock the conscience. The verdict is not disproportionate to the evidence, and bears a reasonable relationship to the numbers presented at trial. This verdict was not excessive.

A court may reduce a jury award only if the award is plainly excessive and exorbitant.[90] "The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption."[91] The total loss of a lifetime of earning capacity resulted in an award of $2,000,000, which is not excessive.[92]

*3. A Woman Wrongfully Told that the Baby She has Carried for Nine Months was Dead, has a Claim for*

---

88. *Id. See also Tulewicz v. SEPTA*, 606 A.2d 425, 426 (Pa. 1991) ("Absent unfairness or impartiality, the jury is entitled to the last word.").

89. *Bey v. Sacks*, 789 A.2d 232, 242 (Pa. Super. Ct. 2001).

90. *Potochnick v. Perry*, 861 A.2d 277, 285 (Pa. Super. Ct. 2004).

91. *Id.*

92. *Layman v. Doernte*, 175 A.2d 530, 534 (Pa. 1961).

*Emotional Distress in Her Own Right.*

Defendant Pottstown claims that the evidence does not sustain a verdict for Victoria Upsey in her own right. A mother, who has carried a child for nine months, experiencing body changes to carry a child, only to have herself and that child catastrophically injured because of the negligence of her own treating physician, has a claim for emotional distress. The mother is herself a patient of the doctor and hospital.[93]

Under Pennsylvania law, a plaintiff can recover for a negligent infliction of emotional distress when a plaintiff's distress stems from a physical injury caused by the defendant;[94] the plaintiff witnessed the serious injury or death of a close family member caused by the defendant;[95] or, the defendant is in a special contractual or fiduciary relationship with the plaintiff where it is foreseeable that breach of a duty will result in the plaintiff's severe emotional distress.[96]

It is beyond argument that defendant Pottstown owed Victoria Upsey herself a duty of care which the jury found had been breached. The closeness of the relationship supports an individual emotional distress claim.[97] A mother whose unborn child is harmed in the womb by a defendant's negligence, while she is physically connected

---

93. Dr. Touey testified clearly that he considered Victoria Upsey his patient: "obviously, there's two patients there. I always consider the mother the first patient and the baby the second patient[.]" N.T., 04/27/12, pg. 65, lines 5 - 7.

94. *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988 (Pa 1987).

95. *Sinn v. Burd*, 404 A.2d 672 (Pa. 1979).

96. *Toney v. Chester County Hosp.*, 36 A.3d 83, 99 (Pa. 2011), *aff'g by an equally divided court*, 961 A.2d 192 (Pa. Super. Ct. 2008).

97. *Krysmalski v. Tarasovich*, 622 A.2d 298, 305 (Pa. Super. Ct. 1993).

to the child, is simultaneously physically impacted. Victoria Upsey witnessed injury to the closest possible relation she can have, a child still within her body.[98]

In a remarkably similar case, the Pennsylvania Supreme Court in *Toney v. Chester County Hospital*[99] affirmed a cause of action for a woman whose doctor negligently failed to inform her that her unborn child had physical abnormalities, not allowing her to prepare herself for the shock. The court held that "some relationships, including some doctor-patient relationships, will involve an implied duty to care for the plaintiff's emotional well-being that, if breached, has the potential to cause emotional distress resulting in physical harm."[100] Likewise, a woman who is negligently told by her doctor that her child is dead while she protests that she can feel the child moving has a claim.[101]

The evidence supporting the personal claim of mother Victoria Upsey is overwhelming.[102] Both the mother and child are the physicians' and the hospital's patients.

---

98. *Hartman v. Oh*, 65 Pa. D. & C. 4th 1, 8 (Lebanon Cnty. Jan. 2, 2004) ("Put into legal parlance, physical harm to a fetus physically impacts the mother and intimately affects someone who is uniquely bonded to the 'victim.'

99. 36 A.3d 83 (2011).

100. *Toney*, 36 A.3d at 95.

101. *See* N.T., 04/20/12, pg. 177, lines 11-13.

102. See description of mental and physical anguish at: N.T., 04/20/12, pg. 177 - pg. 190; N.T. 04/23/12, pg. 19 line 22 - pg. 21 line 7. A plaintiff must suffer a physical injury to recover damages for emotional distress. *Brown v. Phila. Coll. Of Osteopathic Med.*, 760 A.2d 863, 871 (Pa. Super. Ct. 2000). Physical manifestations of emotional suffering, such as depression, nightmares, stress, and anxiety are compensable. *Love v. Cramer*, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992). If there is even a minor physical impact on the plaintiff, then she can recover for all mental suffering traceable to defendant's negligence. *Long v. Yingling*, 700 A.2d 508, 516 (Pa. Super. Ct. 1997). Moreover, a plaintiff is not required to present medical evidence to recover damages for emotional distress. *Krysmalski*, 622 A.2d at 305 ("[M]edical evidence is not required in an action for damages for negligent infliction of emotional distress.").

Plaintiff Victoria Upsey was wrongfully told that the child she had been carrying for nine months, still physically within her body, was dead. Victoria's hysterical reaction was of such emotional upset that Dr. Touey believed Victoria and the family needed significant time to digest the information.[103] Victoria has continually suffered from depression, nightmares, and difficulty sleeping.[104] She has recurring nightmares: "I feel like I'm suffocating, because I can't imagine what Parrys was going through inside of me not being able to breathe, like I'm drowning."[105] Parrys' injury has altered Victoria's very being: "I don't even feel like I'm the same person anymore."[106] Victoria not only witnessed the malpractice which caused devastating injury to her child, she too was, unfortunately, directly involved in the malpractice, and suffered significant, foreseeable, and understandable emotional injury. She has a compensable claim under Pennsylvania law.

*4. No Reversible Error Occurs when a Witness Truthfully Answers Defense Counsels' Questions which Elicit Testimony Defense Counsel Previously Attempted to Exclude.*

Defendant Pottstown claims that a violation of an agreement of counsel requires a new trial.[107] Defendant wrongly claims that Dr. Roy Filly presented standard of care opinion, to a reasonable degree of medical certainty, in violation of that agreement.

---

103. Testimony of Dr. Touey, N.T., 04/17/12, pg. 12, lines 24-25.
104. N.T., 04/23/12, pg. 19-21.
105. N.T., 04/23/12, pg. 20, lines 18-21.
106. N.T., 04/23/12, pg. 19 line 25 - pg. 20 line 2.
107. Defendant presents no case law that a violation of an agreement between counsel which results in truthful testimony is grounds for a new trial. This is, of course, particularly true when defendant itself asks for the testimony.

A party, including defendant Pottstown, cannot appeal from a truthful answer to a question defendant asked.[108] On cross examination defense counsel asked Dr. Filly about the standard of care:

> Q: There's been some discussion in the courtroom about the publication by the ACR and the ACOG, so the American College of Radiology and the American College of Obstetricians and Gynecologists. Some guidelines; right?
>
> A: That's correct.
>
> Q: And guidelines are guidelines, they're not standard of care; correct?
>
> A: I consider them the standard of care, but we don't have to argue about that.[109]

Defense counsel also asked Dr. Filly about his experience with community hospitals:

> Q: Is it true that not all community hospitals even have bedside ultrasound machines in their obstetrics ward?
>
> A: I couldn't answer that.
>
> . . . .
>
> Q: Certainly, in your hospital, they do, is that right?
>
> A: Every hospital I've ever been in has them.[110]

---

108. *See e.g., Lambert v. Polen,* 30 A.2d 115, 117 (Pa. 1943) (holding that while it would be impermissible for a plaintiff to introduce evidence of insurance coverage in a personal injury case, defendant cannot object when defendant is responsible for bringing out that information during cross examination).

109. N.T., 4/18/12, pg. 130, lines 3-12.

110. N.T., 4/18/12, pg. 155 line 21 - pg. 156 line 6.

The defense now claims reversible error in testimony they elicited.[111] This evidence which did not explicitly make any affirmation about Pottstown's standard of care, is not violative of any agreement.

Dr. Filly is a board certified radiologist with a subspecialty in diagnostic ultrasound.[112] Dr. Filly's subspecialty overlaps with Dr. Touey's. He was certainly qualified to testify to standard of care, but was not asked to on direct examination.[113] Dr. Filly testified that in his opinion M mode - a function on the ultrasound machine that allows for a real-time view of the fetal heart - would have detected Parrys' heartbeat.[114] This testimony is strictly factual opinion about the limits of equipment.

Defendant further objects to Dr. Filly's fully descriptive testimony about whether a lower frequency ultrasound transducer would have detected Parrys' heartbeat, and whether use of a 3.5 MHz transducer was a contributing factor to injury.[115] These opinion questions involve the issue of causation and did not violate any agreement.[116] At no time during direct examination was Dr. Filly asked, nor did Dr. Filly comment on whether use of the 3.5 MHz

111. There was no objection from plaintiffs, counsel for Dr. Touey, or counsel for Dr. Stavis.

112. N.T., 4/18/12, pg. 6 line 12 - pg. 7 line 4.

113. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise[.]" Pa.R.E. Rule 702. See also Freed v. Geisinger Med. Ctr., 5 A.3d 212, 216 (Pa. 2010) ("[I]f a witness has any reasonable pretension to specialized knowledge on the relevant subject, he may be offered as an expert witness.").

114. N.T., 4/18/12, pg. 66, lines 7-10. This testimony is very similar to defense expert Dr. Balducci's testimony at N.T., 04/24/12, pg. 41, lines 4-19.

115. N.T., 4/18/12, pg. 73 lines 13-18.

116. Plaintiffs counsel's questions specifically asked whether use of the 3.5 MHz ultrasound equipment "cause or contribute to the incorrect diagnosis[.]" N.T., 4/18/12, pg. 73 lines 13-17.

transducer was below any standard of care.

Sophisticated diagnostic machines will reveal findings which less sophisticated equipment will not. An MRI may reveal cancer undetectable by x-ray. Dr. Filly's factual testimony does not mean that any standard of care requires use of an MRI rather than an x-ray for any specific medical presentation. Neither does the inadequacy of Pottstown's machine, as more fully confirmed and explained by Dr. Balducci, solve the question of whether a "community" hospital must use better equipment to meet the applicable standard of care.

The first time Dr. Filly testified as to the standard of care was when defense counsel explicitly asked him about it. Counsel for Dr. Touey, Mr. Camhi, brought out Dr. Filly's opinion that publications by the ACR and the ACOG represented standard of care. He explicitly asked whether they were standard of care. Faced with that direct question on cross examination, the witness could only truthfully testify that he did consider these publications to state the standard of care. If defendants did not want Dr. Philly to comment on standard of care, they should not have asked his opinion about standard of care. Plaintiffs intentionally avoided any such questions in direct examination.

Defendant also ignores the insignificance of this ambiguous and brief testimony. Unlike Dr. Filly, plaintiffs' expert Dr. Bolognese testified extensively as to the standard of care. He testified that the standard of care required Pottstown to provide, and Dr. Touey to use, a lower frequency ultrasound that had spectral or color

function.[117] plaintiffs' counsel specifically asked Dr. Bolognese whether Pottstown met the standard of care, and whether Dr. Touey met the standard of care, and Dr. Bolognese specifically testified that they had failed to meet the applicable standard of care.[118] This line of questioning stands in stark contrast to the factual and causation inquiries plaintiffs' counsel directed to Dr. Filly.

Moreover, the exact testimony defendant claims is reversible error was confirmed at trial by its own expert witness. Dr. Balducci testified that the "[s]tandard of care is set forth by ACR and AIUM," both for a radiologist and an obstetrician.[119] He also agreed that "the fact that a 3.35 megahertz transducer was used rather than a lower frequency transducer increased the risk that this missed diagnosis would occur[.]"[120] Thus, defendants' own expert testified that having the wrong ultrasound transducer contributed to plaintiffs' injuries.[121] There was no error.

*5. The Court Properly Allowed Pottstown's Risk Manager to Testify about Pottstown's Failure to Produce Critical Fetal Monitoring Strips that Pottstown had in its Records the Entire Time.*

Counsel for Pottstown believes that their failure to produce the fetal monitoring strips for two years, until after discovery had closed and after all expert reports had been exchanged, should have remained hidden. The electronic

---

117. N.T., 4/20/12, pg. 63, lines 8-23.
118. N.T., 4/20/12, pg. 65, lines 13-23; pg. 66, lines 10-18.
119. N.T., 4/24/12, pg. 86, lines 5-12.
120. N.T., 4/24/12, pg. 87, lines 9-13.
121. One of defendants' complained errors is that there is no evidence to support the jury finding that Pottstown provided equipment that did not meet the standard of care which caused plaintiffs' injuries. As related above, Dr. Balducci's own testimony provides evidence to support the jury finding.

monitoring strips were not produced until two years after the action commenced, eight months after discovery closed and only three months before trial.[122] defendant claims that, because it finally produced the strips and all the experts were able to prepare new expert reports, their late production was irrelevant.[123] While factually true that every expert in the case did produce supplemental expert reports to incorporate information contained on the fetal monitoring strips, defendant's late production resulted in about thirty new reports being issued, including some generated just days before trial.[124] The existence and dates of these supplemental reports would inevitably be presented to the jury. To discuss their final reports, the experts undoubtedly would explain or be questioned about when they first received the fetal monitoring strips. The failure of both Dr. Touey and Nurse Kozlowski to have mentioned the existence of the strips during their depositions would have undoubtedly led to their claiming that no questions about them had been asked.

The request for these fetal monitoring strips was first made in a request for production of documents dated January 7, 2009. No answer was received for over a year, until February 15, 2010. Plaintiffs received the medical records on March 1, 2010. Those records included no fetal monitoring strips. No mention of fetal monitoring strips is contained in the medical records. The medical records affirmatively state there were none.[125] Neither

---

122. The fetal strips were produced January 18, 2012. N.T. 04/24/12, pg. 9, lines 22 - 25. Discovery ended June 6, 2011.

123. Of course plaintiff did not seek an order for their production, the medical records said there were no strips and neither Dr. Touey or nurse Kozlowski revealed their existence at their deposition.

124. N.T., 4/24/12, pg. 12, lines 5-13.

125. *See, e.g.,* Testimony of Dr. Filly, N.T., 04/18/12, pg. 41, lines 2-22; testimony of Dr. Bolognese, N.T., 04/18/12, pg. 199, lines 6-25.

Dr. Touey nor Nurse Kozlowski revealed the existence of fetal monitoring strips during their depositions. Plaintiffs received the fetal monitoring strips almost two years later, by letter dated January 18, 2012.

The pretrial conference had occurred two months before, on November 15, 2011. The parties had already submitted pretrial memoranda that listed all expected trial witnesses and exhibits. Plaintiffs received the fetal monitoring strips months after the pretrial conference. Nonetheless, Pottstown moved to quash a subpoena for its risk manager to explain this late production on the basis that she had not been listed as a witness in plaintiffs' pretrial memorandum.[126] This hubris cannot be countenanced.

At trial, the late-produced fetal monitoring strips became a central focus of the case for both sides. Plaintiffs' experts contended that the strips revealed a fetal heartbeat. Defendant's experts countered that what plaintiffs' experts thought was a heartbeat was artificial. Defense counsel in opening address presented what they considered to be a fully reasonable explanation for why the fetal monitoring strips had not been originally produced: the copy service they had used to reproduce the records "[f]or whatever reason . . . didn't copy it until the course of this case, when I discovered that if you have a fetal monitor you should have a fetal monitoring strip."[127]

Even a cursory review of the trial testimony reveals the importance of these fetal monitoring strips. Plaintiffs' expert Dr. Bolognese explained how fetal monitoring strips are created by attaching a transducer on the tocodynamometer to the mother's abdomen to measure

126. N.T., 04/24/12, pg. 15, lines 15-17.
127. N.T., 04/16/12, pg. 145, lines 14 - 18.

uterine pressure.[128] Fetal movement profile blocks printed on the monitoring strips indicate whether the baby is alive. In Dr. Bolognese's opinion, the fetal movement blocks on Parrys Nicholson-Upsey's fetal monitoring strips from 12:40 p.m. to 12:44 p.m., the period of time before Dr. Touey declared the baby dead, demonstrated that Parrys was alive.[129] Dr. Bolognese testified that the failure of Dr. Touey and Nurse Kozlowski to mention the strips at their depositions demonstrated that Dr. Touey had not reviewed the strips before declaring Parrys dead.[130] In his opinion, Dr. Touey breached the standard of care by not reviewing the fetal monitoring strips.[131] Even if Dr. Touey had viewed the strips, Dr. Bolognese opined that both Dr. Touey and Nurse Kozlowski breached the standard of care by failing to interpret them properly and determine that the baby was alive.[132]

Defense experts Dr. Balducci, Dr. Jay Goldberg, Dr. Turhi Gopal, and Nurse Catherine Cochell all testified to their interpretation of the fetal monitoring strips. Dr. Balducci testified at length that the fetal movement profile blocks on the monitoring strips, which Dr. Bolognese identified as evidence that Parrys was alive, were artifact.[133] He assumed that Victoria Upsey had been fitfully in pain, and that Nurse Kozlowski moved the transducer around Victoria's abdomen while attempting to find a fetal heartbeat. These assumptions led him to the opinion

---

128. N.T., 04/20/12, pg. 28, lines 13 - 19.
129. N.T., 04/20/12, pg. 43, lines 10 - 17.
130. N.T., 04/20/12, pg. 53, lines 7 - 13.
131. N.T., 04/20/12, pg. 53, lines 14 - 17.
132. N.T., 04/20/12, pg. 54, lines 2 - 24.
133. "Artifact" is an abnormal appearance on the fetal monitoring strip produced when the ultrasound transducer fails to register a heartbeat signal or some other influence, like maternal heartbeat or movement, affects the signal. N.T., 04/20/12, p. 111, lines 2-12.

that the movement profile blocks were "maternal and transducer[.]"[134] plaintiffs' counsel extensively cross examined Dr. Balducci regarding the fetal monitoring strips. Ultimately, Dr. Balducci altered his testimony and admitted that, based upon Nurse Kozlowski's deposition testimony, moving the ultrasound transducer for a short period of time could not have caused the fetal movement profile blocks.[135]

Defendants' other experts offered similar opinions. Dr. Goldberg, an OB/GYN, testified that he was unable to identify a fetal heartbeat on the strips, and that the fetal movement profile blocks on the strips were the product of artifact either from the mother or the transducer.[136] Dr. Gopal, also an OB/GYN, testified that it was "very clear" that the fetal movement profile blocks were artifact caused by the mother's heartbeat, and other things like bowel and placental activity.[137] Finally, Nurse Cochell, testified "to a reasonable degree of nursing certainty" that the fetal movement profile boxes on the strips did not reflect true fetal movement, but were artifact caused by maternal movement and Nurse Kozlowski moving the transducer.[138]

Dr. Touey acknowledged that the standard of care required him to review the fetal monitoring strips. He testified that although he did not specifically remember, he must have reviewed them because they were on the machine when he walked into the room.[139] There was no record of any such review in the medical records. The fact of this litigation unfortunately is that none of the above

---

134. N.T., 04/24/12, pg. 34, lines 14-22.
135. N.T., 04/25/12, pg. 42, lines 14-23.
136. N.T., 04/25/12, pg. 44 line 2 - pg. 47 line 14.
137. N.T., 04/26/12, pg. 97 line 11 - pg. 99 line 14.
138. N.T., 04/26/12, pg. 76 line 5 - pg. 78 line 3.
139 . N.T., 4/17/12, pg. 132, lines 8-16.

experts were aware of the existence of fetal monitoring strips when preparing their reports, requiring countless supplemental reports exchanged just before trial.[140]

The court permitted plaintiffs to call Ms. Susan Stein, Pottstown's risk manager, to explain the hospital's failure to produce the fetal monitoring strips.[141] Defense counsel filed a motion to quash Ms. Stein's subpoena, claiming her testimony was irrelevant and prejudicial since, after all, defendants had finally produced the fetal monitoring strips.

Susan Stein had verified the discovery responses of February 15, 2010, which failed to produce any fetal monitoring strips.[142] There can be no question that the person who verified the discovery responses is an appropriate witness at trial.[143] Ms. Stein admitted that

---

140. The medical records the experts examined gave them no hint that there was missing fetal monitoring strips; rather, the records, prepared by Nurse Kozlowski after delivery of the baby, indicated that there were no fetal monitoring strips. *See* testimony of Nurse Kozlowski, N.T., 04/26/12, pg. 40 line 16 - pg. 42 line 12. Moreover, the summary contained in the medical records was written by another nurse who Nurse Kozlowski had no contact with and who had no knowledge of the strips. N.T., 04/26/12, pg. 42 line 17 - pg. 43 line 12.

141. Without doubt, had defendants' motion in limine to preclude all testimony about the late production been granted, defendants would have cross examined the plaintiffs' experts on their failure mention the fetal monitoring strips in their earlier reports.

142. N.T., 04/24/12, pg. 64 line 10 - pg. 65 line 22.

143. Stein had already acted on behalf of defendant Pottstown when she signed and verified the answer to the request for production, representing that the complete medical record had been transmitted to plaintiffs. Pa. R. Civ. P. 4009.12(c). Even assuming that Stein had not been properly designated in plaintiff's pretrial memorandum, her testimony resulted from Pottstown's own failings, and her crucial testimony and in no way prejudiced defendant. Defendant knew Stein was involved in this matter and could be called at trial. Plaintiffs could not have known they needed specifically to designate Stein until receiving the monitoring strips three months before trial. *See Tenner v. Loblaw*, 217 A.2d 787, 788 (Pa. Super. Ct. 1966) (finding no error where trial court allowed witness not identified in answers to interrogatories to testify where calling party

when the medical records were produced to counsel pursuant to the appropriate prepared request, they did not contain the fetal monitoring strips.[144] She also testified that she was the one who verified the request for production of documents after medical records were again sent to counsel without any fetal monitoring strips.[145] In fact, the medical records state that electronic fetal monitoring was not even performed:

Q: The medical record in this case states that electronic fetal monitoring wasn't even performed. Doesn't it?

A: Can I see [the record]?

Q: And where there are choices, where there are choices for fetal heart rate, external or internal, uttering contraction, external or internal or none, in this form, "none" was checked off; correct?

A: Yes.[146]

Counsel for plaintiffs directed two other areas of inquiry to Ms. Stein: information, misinformation and failure of information about the Hospital's ultrasound equipment and "the idea of a community hospital having some handicap in terms of providing adequate equipment."[147] In fact, while plaintiffs couched it as a "handicap," a recurrent defense theme was the implication that since Pottstown Hospital was a small community hospital they should not be held to the same medical standard as big Philadelphia teaching hospitals.

only learned of witness three months before trial).
144. N.T., 04/24/12, pg. 67, lines 8-15.
145. N.T., 04/24/12, pg. 65, lines 10-22.
146. N.T., 04/24/12, pg. 69 line 24 - pg. 71 line 9.
147. N.T., 04/24/12, pg. 18, lines 10-18.

Susan Stein's testimony factually contradicted and effectively destroyed the small community hospital defense. She agreed that even a community hospital must provide proper equipment and proper care, and that Pottstown had adequate resources to provide all necessary and proper equipment.[148] In fact, she revealed that Pottstown is owned by the national for - profit company Community Health Systems, Inc.[149] She also revealed that Community Health Systems owns and operates over 100 hospitals in 29 different states.[150]

Ms. Stein further conceded that when in discovery plaintiffs asked Pottstown for the specifications and manuals concerning the ultrasound equipment, she produced and verified inaccurate information.[151] She admitted to providing misinformation about a different, more sophisticated, machine in response to discovery requests.[152] She testified that she had only provided information about the ultrasound machine used by the technician in radiology, the machine that discovered Parrys' heartbeat, 81 minutes after being ordered "stat" following the misdiagnosis of death. She admitted that the information given by the hospital had not been corrected until after Dr. Touey's deposition.[153] Previously, defendant had identified a machine that had color capability, while the actual machine had no color capability.[154] Likewise, the machine originally identified had spectral imaging but the actual machine used did not. Plaintiffs' counsel

---

148. N.T., 04/24/12, pg. 90, lines 6-24.
149. N.T., 04/24/12, pg. 57, lines 19-25.
150. N.T., 04/24/12, pg. 58, line 2-11.
151. N.T., 04/24/12, pg. 72 line 17 - pg. 77, line 8.
152. N.T., 04/24/12, pg. 103, lines 6-9.
153. N.T., 04/24/12, pg. 80 lines 7-12. Defendant had submitted to plaintiffs a revised answer to discovery requests on January 28, 2011.
154. N.T., 04/24/12, pg. 82, lines 3-8.

did not learn this until receipt of a letter from Pottstown's counsel, dated June 28, 2011, stating that the transducer on the ultrasound machine Dr. Touey actually used did not contain the enhanced obstetrics package that would have allowed for frequencies reduced below 3.5 MHz. The originally identified machine had that capability.[155]

When defendant Pottstown finally properly identified the equipment, it produced a manual for the ultrasound machine listing its specifications.[156]

Just as important about discovery mis-information, the manual for the machine was presented to the jury, and Ms. Stein agreed the service manual for the machine actually used required maintenance be performed every twelve months.[157] Ms. Stein also admitted that the hospital had no service records whatsoever for the ultrasound machine, and that the totality of the maintenance records of the hospital was a single service memo.[158] It was not possible to determine whether any maintenance or any service of any kind had been performed on this machine between the time Dr. Touey came to the hospital in 1997 and the time a bedside ultrasound was performed on Victoria Upsey more than a decade later on August 10, 2008.[159] The one service memo Pottstown Hospital did produce was for service performed three months after Dr. Touey's deposition had been taken.[160] The jury was entitled to conclude from Ms. Stein's testimony alone, that the hospital failed to perform

---

155. N.T., 04/24/12, pg. 83, lines 5-22.
156. The manual was part of the exhibit marked P - 435.
157. N.T., 04/24/12, pg. 87, lines 16-23.
158. N.T., 04/24/12, pg. 84, lines 6-22.
159. N.T., 04/24/12, pg. 88 line 25 - pg. 89 line 8.
160. N.T., 04/24/12, pg. 89, lines 9-15. The defense offered no evidence of any other service to this machine, even though Ms. Stein claimed there was the existence of a maintenance program under the facilities department of the hospital.

necessary maintenance on the machine for over a decade.

On examination by counsel for Pottstown, Ms. Stein confirmed that the lone service memo produced indicated that service was done on the machine on November 24, 2010, and that the machine had been returned to service on the labor delivery floor.[161] She testified that the standard procedure of Pottstown Hospital was to take fetal monitor strips to a warehouse.[162]

On redirect examination, Ms. Stein testified that another bedside ultrasound machine had been purchased to replace the one used on Victoria, and while she did not know the MHz frequency or whether it had color capabilities, she assumed that it was a better machine.[163] After having first suggested to the jury that the same machine continued in exclusive use, when counsel on redirect countered this suggestion Defense counsel objected and moved for a mistrial. No mistrial was warranted. On cross examination, defense counsel had intentionally presented testimony that after being serviced, the same machine had been returned to the hospital floor and was still in use.[164] This highlighted and confirmed Dr. Touey's prior testimony that the machine was still in use at the hospital.[165] These questions by defense counsel were intended to, and clearly implied that the same machine, appropriate for use in 2008 when Parrys and Victoria Upsey were in the hospital, was still appropriate for use by the hospital at the time of trial. This clear implication could be examined and rebutted on redirect.[166]

---

161. N.T., 04/24/12, pg. 92 lines 5-19.
162. N.T., 04/24/12, pg. 100, lines 13-20.
163. N.T., 04/24/12, pg. 107, lines 2-19.
164. N.T., 04/24/12, pg. 92, lines 5-19.
165. N.T., 04/17/12, pg. 74, lines 15-21.
166. By analogy see the rule of completeness contained in Pa.R.E.

212

Plaintiffs' counsel needed only two questions: whether the bedside ultrasound in Pottstown still has a 3.5 MHz transducer without color and spectral imaging, and whether the new machine was of higher quality.[167] These two questions constituted 25 seconds in a 16 day trial. Ms. Stein had no specific information. These questions revealed that Pottstown had purchased another ultrasound machine. There was no testimony whatsoever that the machine was truly any different, had a different MHz frequency, had a color function, or even was actually a better machine. This testimony did not even require a cautionary instruction and certainly not a mistrial.[168] Defense counsel never requested a cautionary instruction, or striking of any testimony. Although the trial continued for days after Ms. Stein testified, defendant never presented any evidence describing that second machine or its quality. The questions were entirely proper to counter the implication and false impressions presented by defense questioning that the same machine, good then, was still good.

*6. Plaintiffs' Questions about Dr. Gopal's Prior Patient did not Affect Dr. Gopal's Testimony and the Court Appropriately Instructed the Jury to Disregard the Questions.*

Defendant demands a new trial because plaintiffs asked

---

106: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part - or any other writing or recorded statement that in fairness ought to be considered at the same time."

167. N.T., 04/24/12, pg. 107, lines 2-19.

168. *Commonwealth v. Maloney*, 365 A.2d 1237, 1242-43 (Pa. 1976) ("Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial."); *Allied Elec. Supply Co. v. Roberts*, 797 A.2d 362, 365 (reversing trial court's grant of mistrial where witness briefly mentioned insurance coverage in negligence action because mere mention of insurance did not warrant mistrial without showing of prejudice to moving party).

questions about defense expert witness Dr. Gopal's other patients. Plaintiffs' counsel asked Dr. Gopal if a patient named Hilda Vargas presented to his hospital with pelvic pain and the doctors could not find a fetal heartbeat, and they performed a C-section, would Dr. Gopal consider it assault and battery. Although there was an objection, Dr. Gopal answered the question saying: "No, I would not because . . . ."[169] At side bar, the court came to understand that Vargas had been Dr. Gopal's patient who, plaintiffs claimed, had been treated in a manner inconsistent with Dr. Gopal's testimony at trial. The objection was overruled. Plaintiffs' counsel asked whether Dr. Gopal remembered Vargas, put up a photograph, of a woman, and asked: "Do you recognize this lady?" To both questions Dr. Gopal answered "no sir."[170]

The jury had been instructed at the beginning of the trial that questions are not evidence. The jury had been told that only answers from sworn witnesses constitute the evidence on which the case must be decided.[171] Accordingly, the only evidence was that Dr. Gopal did not know anyone by the name of Hilda Vargas, and he did not recognize the individual in the picture.

At side bar the defense renewed its objection and moved for a mistrial. The court learned in greater detail that Ms. Vargas had been a clinic patient whose treatment had been overseen by Dr. Gopal, but that Dr. Gopal had not signed any discharge summary, and had personally only ordered lab tests. The court also learned that Dr. Gopal's signature does not appear anywhere in Vargas' chart. At that point, on the basis of Pennsylvania Rule of

---

169. N.T., 04/26/12, pg. 25 line 21 - pg. 26 line 9.
170. N.T., 04/26/12, pg. 28, lines 12-15.
171. N.T., 04/16/12, pg. 22, lines 22-25.

Evidence 611(a), the court precluded any further questions concerning Ms. Vargas. The court controlled the order and manner of proof in the case to avoid a mini trial over Dr. Gopal's involvement in Ms. Vargas' treatment and a side trial about whether Ms. Vargas' presentation and medical care was comparable to Victoria Upsey's. The court also instructed the jury:

> Ladies and Gentlemen of the jury, as I told you several days ago I think when the case first began, the statements of counsel are not evidence and neither are any of the questions evidence, so the questions of plaintiff's counsel and any answers that you heard concerning patient Vargas are to be disregarded. They are stricken from the record. The objection is sustained and you're not to consider anything about some other patient Vargas.[172]

A jury heeds the instructions by the court given.[173] The mere mention of a patient the doctor did not remember cannot possibly be so prejudicial as to require a new trial.[174]

Moreover, the substance of Dr. Gopal's testimony remained unaffected. Dr. Gopal's opinion was that Victoria

---

172. N.T., 04/26/12, pg. 44 line 20 - pg. 45 line 7.

173. *Commonwealth v. Steele*, 559 A.2d 904, 913 (Pa. 1989) ("There is a presumption in the law that the jury followed the instructions given by the trial judge[.]").

174. "A new trial is not warranted merely because some irregularity occurred during the trial or another judge would have ruled differently[.]" *Rettger v. UPMC Shadyside*, 991 A.2d 915, 923 - 24 (Pa. Super. Ct. 2010) (holding that trial court's decision to limit certain testimony in medical malpractice case under Pa.R.E. 611 because it was of marginal relevance and added unnecessary issues to trial did not warrant new trial as it was not error). The complaining party must demonstrate that the trial court's error caused prejudice by affecting the verdict. *Knowles v. Levan*, 15 A.3d 504. 507 (Pa. Super. Ct. 2011) (holding that trial court's admission of evidence regarding liability in a negligence case where liability had been conceded constituted error, but was harmless because the verdict bore a reasonable relation to the evidence).

Upsey's placental infarction occurred five days earlier, and her abruption began early on the day of delivery, before her admission to the hospital.[175] His testimony was cumulative of other expert witnesses. Counsel for Pottstown acknowledged to the court at sidebar: "This witness is a general obstetrician like Dr. Touey; so I think his observations are what are actually exactly along the lines of Dr. Touey . . . ."[176] Actually, Dr. Gopal confirmed plaintiffs' theory of liability that the ultrasound equipment the hospital provided was inadequate:

> The only way I can explain [the inability to locate a fetal heart rate] is when the massive insult to the baby occurred, as a result of sudden deprivation of considerable amount of blood supply, the heart becomes stunned and goes into a severe deep bradycardia. Severe bradycardia can be as low as one per minute. It is so slow as to be undetectable on ultrasound or on a fetal monitor.[177]

Therefore, Dr. Gopal's minimal testimony claiming no knowledge about a hypothetical patient had no bearing on the course of the trial or the verdict.

*7. The Court Properly Controlled Testimony at Trial to Ensure that "Professional Witnesses" Responded to the Proper Questions Asked.*

Finally, defendants claim that a new trial should be granted because the court insisted that professional expert witnesses for both sides fairly respond to the actual questions counsel asked on cross examination. "Professional experts" appeared to prefer not to answer

---

175. N.T., 04/26/12, pg. 79 line 10 - pg. 80 line 6.
176. N.T., 04/26/12, pg. 88 line 23 - pg. 89 line 2.
177. N.T., 04/26/12, pg. 93, lines 2-11.

the question asked. Defendant speciously argues that this court's control over the mode and manner of interrogation at trial, exercised to effectuate the purpose of the Pennsylvania Rules of Evidence as set forth in Pennsylvania Rule of Evidence 102 that "the truth may be ascertained and proceedings justly determined," reflected improper opinion by the court. At no time during the course of the two-and-one-half week trial was recusal requested. Neither was any complaint whatsoever raised as to the court's proper control over the conduct of trial pursuant to Pennsylvania Rule of Evidence 611(a). Rule 611(a) reads: "Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time and (3) protect witnesses from harassment or undue embarrassment." This non-issue has been waived.[178]

As the Supreme Court recognized in *Cooper v. Schoffstall*, unfortunately some professional expert witnesses have moved from the role of objective scientist presenting testimony designed to assist the jury, to the status of professional witness.[179] The Supreme Court defined a professional witness as anyone who "might color, shade,

---

178. Generally, an objection to a court's statement or question must be made at trial, before a responsive answer is given by the witness, or the objection is waived and cannot be first made in post-trial motions or on appeal. *Robert v. Chodoff*, 393 A.2d 853, 870 (Pa. Super. Ct. 1978) ("[T]he absence of an objection by counsel to the court's statement . . . constitutes a waiver of this particular objection."); *Dilliplaine v. Lehigh Valley Trust Co.*, 322 A.2d 114, 116 (Pa. 1974) ("Requiring a timely specific objection to be taken in the trial court will ensure that the trial judge has a chance to correct alleged trial errors. This opportunity to correct alleged errors at trial advances the orderly and efficient use of our judicial resources.").

179. *Cooper v. Schoffstall*, 905 A.2d 482, 495 (Pa. 2006).

or slant his testimony in light of the substantial financial incentives."[180]

Unfortunately, the professional expert witnesses this jury heard on occasion obfuscated, pretended not to understand the import of clear questions, and effectively answered the questions that they wanted to be asked rather than the questions posed.[181] The court properly insisted that even professional witnesses answer cross examination questions, so that the truth could be ascertained.[182]

*8. Plaintiffs' Delay Damages and Attorney's Fees were Properly Calculated.*

Plaintiffs filed post trial motions seeking delay damages and the calculation of attorney fees owed for the recovery of on future medical bills pursuant to the Medical Care and Availability and Reduction of Error Act (MCARE).[183] After extensive research, the court concludes that plaintiffs' motions present issues of first impression. The only prior decisions arguably relevant are the Delaware County Court of Common Pleas decision in *McCloskey v. Shatouhy* regarding delay damages,[184] and the Superior Court decision in *Saylor v. Skutches* discussing the award of attorney's fees. The *Saylor* case is factually distinct, distinguishable, and entirely inapposite.[185]

---

180. *Id.* at 495.

181. *See* testimony of Dr. Balducci, N.T., 04/24/12, pg. 74 line 3 - pg. 84 line 23, and pg.

182. *Com. v. McKeithen*, 44 A.2d 282, 284 (Pa. 1945) (holding that "when a witness becomes combative, assumes to apply rules of evidence and generally exhibits a hostile attitude toward counsel" a trial judge may admonish. reprimand, or punish a witness because of "the oath which the witness takes to tell the truth, the whole truth, and nothing but the truth.").

183. 40 P.S. § 1303.101, et seq. (2002).

184. *McCloskey v. Shatouhy*, No. 05-14254 (C.P. Del. Cnty. Nov. 17, 2008).

185. *Sayler v. Skutches*, 40 A.3d 135 (Pa. Super. Ct. 2012).

Pennsylvania Rule of Civil Procedure 238(a)(1) provides for damages for delay to be added to the jury verdict by the court: ·

> At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury . . . and shall become part of the verdict, decision or award.[186]

In *Colodonato v. Consolidated Rail Corporation*, the Supreme Court held that Rule 238 provides for additional damages to be computed in the form of simple interest on the full amount of compensatory damages.[187] Likewise, the Honorable Judge Burr ruled in *McCloskey v. Shatouhy,* the only decision directly on point, that damages for delay are to be awarded on the entire jury verdict, including future medical expenses.[188]

The MCARE does not address Pennsylvania Rule of Civil Procedure 238 delay damages at all, despite having exceptionally detailed provisions concerning damages. Rule 238 was enacted in 1988. The Legislature knew of Rule 238 when it passed the MCARE Act. In ascertaining legislative intent, courts should assume the Legislature considered "[t]he circumstances under which [legislation] was enacted," and the "former law."[189] The Legislature's exclusion of Rule 238 in MCARE is deemed intentional.[190]

---

186. Pa. R. Civ. P. 238(a)(1)
187. *Colodonato v. Consolidated Rail Corp.,* 470 A.2d 475, 477 (Pa. 1983).
188. *McCloskey,* No. 05 - 14254, slip op. at 12.
189. 1 Pa.C.S. § 1921(c). S*ee also Retail Master Bakers Assoc. v. County of Allegheny,* 161 A.2d 36, 39 (Pa. 1960).
190. The Legislature is presumed to know prior decisional law and

Following Rule 238 as written by the Supreme Court, this court properly awarded the sum of $2,515,901 as delay damages.

Plaintiffs post-trial motions required the reduction of future medical care damages to present value. Rule 238(b)(3) required that future damages be reduced to present value to award delay damages.[191] Likewise, § 509(b)(1) of MCARE requires that future damages be reduced to present value to determine the proper attorney's fees: "[F] uture damages for medical and other related expenses shall be paid as periodic payments after payment of the proportionate share of counsel fees and costs based upon the present value of the future damages awarded pursuant to this subsection."[192] The plain language of MCARE dictates that payment of attorney's fees are to be made in a lump sum and not sequentially as future medical costs accrue. Thus the MCARE Act requires reduction to present value of the cost of future medical care.

Although counsel spent significant time and energy briefing and arguing over the proper calculation for present value pursuant to Rule 238 and the MCARE Act, in fact, "present value" is a well known, well defined term in Pennsylvania law. Before the Supreme Court decision in *Kaczkowski v. Bolubasz*,[193] where the Supreme Court adopted the total offset method of calculating future lost

---

rules. 1 Pa. C.S. § 1922.

191. Pa. R. Civ. P. 238(b)(3) permits a plaintiff to recover delay damages only when plaintiff's recovery is more than 125 percent of a defendant's offer of settlement "or the cost of the structured settlement plus any cash payment to the plaintiff." Unquestionably, "[t]he delay damages . . . must be calculated on the verdict as molded, as it is the molded verdict which represents the jury's actual assessment." *Liberty v. Geneva College,* 690 A.2d 1243, 1245 (Pa. Super. Ct. 1997).

192. 40 P.S. § 1303.509 (2002).

193. *Kaczkowski v. Bolubasz,* 421 A.2d 1027 (Pa. 1980).

income, prior decisional law defined "present worth" and "present value." As early as 1934, the Supreme Court in *Littman v. Bell Telephone Company of Pennsylvania* held:

> [W]hen the gross amount of what claimant will lose in future earnings has been calculated, this amount will have to be reduced to its "present worth," i.e., to a sum which if paid on the date of the verdict would then be a just cash equivalent of the sum total of such lost future earnings.[194]

The MCARE Act contains an extensive description of how a future damages judgment may be satisfied, but it does not define "present value." The legislature, of course, knows and understands prior Supreme Court decisions.[195] Accordingly, since "present worth" is not a novel term, its meaning as contained in MCARE is precisely as traditionally understood through appellate decisions.[196]

In this verdict, the jury found that medical expenses would be incurred until 2058, and awarded these damages on a yearly basis as required by the Act. Adding the annual awards, the total amounted to $65,004,670. This court was therefore required, pursuant to § 509(b) of the MCARE Act, to determine what counsel's fees had been earned based on the present value of this future damage award. Plaintiffs' expert economist, Chad Staller, M.B.A./J.D., performed calculations to reduce the future medical

---

194. *Littman v. Bell Tel. Co. of Pa.*, 172 A. 687, 690 (Pa. 1934); *see also Vescio v. Pa. Elec. Co.*, 9 A.2d 546, 551 (Pa. 1939) (reiterating this definition of "present worth").

195. *See* 1 Pa.C.S. § 1922(4) ("[W]hen a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.").

196. If this had not been what the legislature intended a different definition would have been included in the definitional section of the act. There is no such definition. *See* 40 P.S. § 1303.503.

expenses to present value. According to Mr. Staller, the proper discount rate, based on a blended rate of investment returns, to reduce future medical expenses to present value is 2.96 percent.[197] The future medical expenses, reduced to present value using this discount rate is $29,793,338. Counsel is entitled to one third of this $29,793,338 pursuant to their contingent fee agreement.

Defendant has not presented any calculation of reduction to present value. Instead, defendant has presented a figure which they claim is the cost of an annuity to provide medical care in the annual amounts awarded by the jury. Defendant reasons that pursuant to § 509(b) of MCARE, defendant must be allowed to satisfy the judgment for future medical costs by purchasing an annuity. Payments for future medical care and payments pursuant to such an annuity cease if Parrys Nicholson-Upsey, for whom the medical expenses are awarded, dies.[198] defendant claims that this annuity, exclusive of attorney's fees, can be purchased for the amount of $12,478,013.35,[199] and this cost is the figure on which plaintiff's counsel fee should be calculated.

The cost of such an annuity is dramatically different

197. N.T., 09/14/12, pg. 110 line 3 - pg. 111 line 20.
198. MCARE specifically states: "Liability to a claimant for periodic payments not yet due for medical expenses terminates upon the claimant's death." 40 P.S. § 1303.509(b)(5).
199. No verification of this amount, or any statement as to what company this "annuity" is from, or whether it includes any insurance to guarantee these payments in the event the initial carrier becomes insolvent, was provided to the court. Approving this annuity with so little information would be in stark contrast to the strictures a court must follow in approving an annuity for a minor's compromise petition, where a court must determine that the annuity is "underwritten by a financially responsible entity that assumes responsibility for future payments[.]" Pa. R. Civ. P. 2039(b). Therefore, this court cannot ascertain whether an annuity purchase at this cost should be approved by this or any other court.

from the present value of future medical expenses. The cost of an annuity, which terminates at the death of annuitant, is a life insurance policy with defined annual payouts. In calculating the cost of a life insurance policy, the health of the insured and her life expectancy are likely to be the most important actuarial factors. In fact, these actuarially calculated savings are precisely the reason medical malpractice insurers sought the ability to satisfy an MCARE judgment by purchase of an annuity, and insisted on payments ceasing upon the death of the annuitant. The cost of a life insurance policy is exceptionally different from the present value of awarded medical payments as continually defined by the Supreme Court.[200]

Indeed, at trial defendant presented testimony that Parrys Nicholson-Upsey has a shortened life expectancy. Their expert opined that Parrys Nicholson-Upsey would die at or before she reached the age of 21.[201] Defendant's estimate of Parrys' life expectancy is not only significantly less than plaintiffs', it is a full quarter century less than the jury found in awarding medical expenses to the year 2058. If the carrier offering to sell the annuity actually accepted the testimony presented under oath at trial, they expect to pay for only 18 years of medical bills. Defendant proposes to calculate attorney's fees on a life expectancy specifically, explicitly, and factually rejected by the jury.

Beyond the fact that the cost of an annuity or life insurance policy is significantly lower than the verdict for

---

200. The medical bills reduced to present value are $29,793,338. Defendant presents that the cost of the annuity life insurance payment is $12,473,013.35.

201. Testimony of Dr. Richard Katz, N.T., 04/25/12, pg. 109, lines 2-12. Plaintiffs' experts testified that assuming she receives proper medical care, Parrys is expected to live 78.7 more years. N.T., 04/23/12, pg. 65, lines 14-16.

future medical care reduced to present value as required by the MCARE Act, defendant's argument that attorney's fees must be calculated on the cost of an annuity because the defendant must be allowed to fund the settlement by annuity completely and directly contradicts the MCARE Act. Nothing in the MCARE Act mandates the purchase of an annuity. Section 509(b)(6) states: "Each party liable for all or a portion of the judgment shall provide funding for the awarded periodic payments, separately or jointly with one or more others, by means of an annuity contract, trust, or other qualified funding plan which is approved by the court."[202] Defendant Pottstown and its parent company, which operates 190 hospitals around the country, could reasonably decide to take upon itself the risk of having to pay the full judgment periodically, and save for itself the potential benefit obtained from Parrys Nicholson-Upsey's early demise by creating its own "qualified funding plan" approved by the court. A defendant may create a self-directed funding plan with safeguards sufficient to be approved by the court.[203]

Defendant's reliance on *Saylor v. Skutches*,[204] is entirely misplaced. That case is not applicable because the plaintiff had died and there were no future medical expenses to be paid. In *Saylor*, the Superior Court held that where the plaintiff died before judgment was entered, counsel fees could be determined on the basis of medical expenses already accrued.[205] In *Saylor*, the actual medical costs for the care the plaintiff had received between verdict and

---

202. 40 P.S. § 1303.509(b)(6).

203. The court must assume that "the General Assembly intends the entire statute to be effective and certain," and therefore must give meaning to MCARE's "other qualified funding plan" language. 1 Pa.C.S. 1922(2).

204. 40 A.3d 135 (Pa. Super. Ct. 2012).

205. *Saylor*, 40 A.3d at 140.

death had been precisely determined at the time attorney's fees were calculated. There were no future medical costs to be reduced to present value. The MCARE Act requires that attorney's fees be calculated after all future medical expenses contained in the verdict are reduced to present value. Since there were no future medical expenses, of course they could not be the basis of any attorney's fees.

The court accepts Dr. Staller's finding that an appropriate discount rate is 2.96 percent and his concomitant calculation that the present value of the future medical expenses as awarded by the jury is in the amount of $29,793,338. Added to that are the damages awarded which do not require reduction to present value in the amount of $13,500,000. The court properly molded the jury verdict to add $2,515,901 in delay damages for a total award of $45,809,239. Plaintiffs' attorney's fees for the future medical care portion of their recovery are $9,931,113.

For the reasons set forth above, the jury verdict, the Rule 238 delay damages, and plaintiffs' attorney's fees award should be affirmed.